CHICKASAW NATION,
Plaintiff–Appellant,

v.

STATE OF OKLAHOMA ex rel. OKLA-
HOMA TAX COMMISSION, Robert E.
Anderson, Chairman of the Tax Com-
mission, Robert L. Wadley, Vice–Chair-
man of the Tax Commission, and Don
Kilpatrick, Secretary of the Tax Com-
mission, Defendants–Appellees.

No. 92–7117.

United States Court of Appeals,
Tenth Circuit.

July 29, 1994.

Bob Rabon of Rabon, Wolf & Rabon, Hugo, OK, for plaintiff-appellant.

David Hudson, General Counsel (with David Allen Miley, Asst. Gen. Counsel, on the brief), Oklahoma Tax Com'n, Oklahoma City, OK, for defendants-appellees.

Before ANDERSON, McKAY, and EBEL, Circuit Judges.

McKAY, Circuit Judge.

Appellant Chickasaw Nation ("Tribe" or "Chickasaw"), a federally recognized Indian tribe, challenged the State of Oklahoma's authority to impose certain taxes on sales, income, motor fuel and 3.2% beer to transactions occurring in Chickasaw Indian country. The case was submitted to the district court upon stipulated facts on cross motions for summary judgment. The Chickasaw appeal from the district court's grant of summary judgment on each of the issues in favor of the State of Oklahoma and from that court's denial of the Chickasaw's cross-motion for summary judgment.

## I. FACTS

In submitting the case to the district court for rulings on the cross-motions for summary judgment, the parties stipulated, *inter alia,* that

B. Plaintiff [the Tribe] owns and operates retail sales outlets on lands held in trust for it by the United States on which it sells tobacco products, motor fuel, beer and other goods. It does not collect sales taxes on its sales to tribal or non-tribal members but is required to pay sales taxes on motor fuel products and beer when it purchases them from its wholesale vendors at said retail locations. Defendants [the State] impose sales taxes on retail purchases of goods made by plaintiff where defendants contend such goods are used for "proprietary" as opposed to "governmental" purposes and when defendant contends the goods are purchased for resale to non-tribal members.

C. Plaintiff has approximately 275 tribal member and non-tribal member employees who earn their wages on tribal trust lands. Defendants are collecting state income taxes on the earnings of said employees.

(Amended Pre–Trial Order at 2–3, Appellant's App. Doc. 11.)

■ We review the grant or denial of summary judgment *de novo,* applying the same legal standard used by the district court. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990). We view the record in the light most favorable to the party opposing the grant of summary judgment, here, the Tribe, to determine whether there is any genuine issue of material fact remaining for trial. *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991); *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991).

■ In their Amended Joint Pretrial Order, the parties stipulated that the sole issues of "fact" remaining to be litigated were as follows:

A. The Chickasaw Nation is beneficiary to treaties with the United States which agree that no state may pass laws for it. (Defendant contends that this is a question of law and not an issue of fact.)

B. Defendants have attempted to and are imposing state tax laws on the plaintiff tribal government and its constitutents [sic] in violation of said treaties, congressional enactments and federal policy. Such conduct by the defendant is preempted by federal law and infringes on plain-

tiff's right to self-government and frustrates federal policy. (Defendant contends that this is a question of law and not an issue of fact.)

(Amended Pre–Trial Order at 4). With respect to the first issue, the Chickasaw point to treaty language stating that "no territory or state shall ever have a right to pass laws for the government of the [Chickasaw] or their descendants."[1] The State responds that the treaties cited by the Chickasaw are not relevant because they were later abrogated by acts of Congress. The district court did not address the issue, finding that the taxes did not abridge the Tribe's right of self-government and thus did not violate the treaty language. We agree with the State that both the continuing viability of the treaties cited by the Chickasaw and the interpretations thereof are questions of law and not of fact. Turning to the second stipulated issue remaining for trial, we conclude that whether the taxes imposed by the State contravene the aforementioned treaties and are violative of the Chickasaws' right to self-government is also a question of law rather than an issue of fact.

Accordingly, as the parties have stipulated to all of the facts before us, there can be no genuine issue of material fact remaining for litigation, and our review is limited to the question whether the substantive law was correctly applied. *Franks v. Nimmo,* 796 F.2d 1230, 1235 (10th Cir.1986). We therefore review *de novo* the district court's treatment of both of these issues and their impact on the four taxes in dispute in this case.

## II. BEER TAX

The Chickasaw operate retail stores in which they sell 3.2% beer. This beer is purchased from wholesale distributors. Oklahoma law provides for a tax upon 3.2% beer, in the amount of $11.25 per 31 gallons. 37 Okla.Stat.Ann. § 163.3 (West 1990). The

district court concluded that the State of Oklahoma had a strong interest in regulating 3.2% beer and that under our holding in *Citizen Band Potawatomi v. Oklahoma Tax Com'n,* 975 F.2d 1459 (10th Cir.1992), this regulatory authority encompassed the power to tax the sale of such beer. The district court thus assumed that the power to tax is encompassed within the power to regulate. We first address this assumption.

In *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), the Supreme Court faced the issue whether California could require a member of an Indian tribe who operated a general store on an Indian reservation, in which she sold alcoholic beverages, to obtain a state liquor license. The Court set out a two-part test to determine when state regulation of activities in Indian country is preempted. *Id.* at 718, 103 S.Ct. at 3295. Such preemption occurs when application of state law: 1) "would interfere with reservation self-government," or 2) "would impair a right granted or reserved by federal law." *Id.* (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). In determining whether application of state law would interfere with Indian self-government, the court must consider the tradition of Indian sovereignty. If there is a tradition of Indian sovereignty in the area concerned, then an explicit statement from Congress providing that state law shall apply is usually required. *Id.* 463 U.S. at 719–20, 103 S.Ct. at 3295–96. The *Rice* Court concluded that "tradition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians." *Id.* at 722, 103 S.Ct. at 3297.

Turning to the second prong of the test, the Court considered whether the state liquor licensing provisions were preempted by federal law. The Court held that, in enacting 18 U.S.C. § 1161,[2] Congress intended to del-

---

1. The treaty actually refers to the Choctaw Nation rather than the Chickasaw. However, the treaty provisions were later applied by Congress to the Chickasaw. *See supra* n. 9.

2. "The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title [barring introduction of alcoholic beverages into Indian country], shall

not apply ... to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country...." 18 U.S.C. § 1161 (1988).

egate both to the states and to the tribes, its authority to regulate liquor transactions. *Id.* at 730–31, 103 S.Ct. at 3101–02. Accordingly, the Court held that section 1161 authorized state regulation rather than preempting it, and the state could properly require tribe members to obtain a state liquor license. *Id.* at 734, 103 S.Ct. at 3303.

In *Potawatomi,* this court held that the Supreme Court's reasoning in *Rice* was applicable to Oklahoma's licensing requirements with respect to 3.2% beer, notwithstanding the argument that such beer was not an "alcoholic beverage" within the scope of § 1161 because of the bifurcated Oklahoma regulatory scheme classifying such beer as a "nonintoxicating beverage." *Potawatomi,* 975 F.2d at 1462–64. We held that Congress in § 1161 had delegated the authority to regulate liquor, including 3.2% beer, and that Oklahoma had a "significant regulatory interest" in 3.2% beer despite its classification as a "nonintoxicating beverage." *Id.* at 1464.

■ The Tribe argues that, notwithstanding the Court's statements in *Rice* about the power to "regulate" liquor transactions, and notwithstanding this court's statements on that matter in *Potawatomi,* that power has nothing to do with the power to tax those transactions. We agree that the power to regulate does not automatically encompass the power to tax in all circumstances. However, "[t]he mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised." *American Petrofina Co. of Texas v. Nance,* 859 F.2d 840, 841 (10th Cir. 1988) (quoting *State ex rel. Tindal v. Block,* 717 F.2d 874, 887 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984)). Likewise, we do not find the fact that the beer taxes are deposited into the general treasury of the State of Oklahoma, Okla.Stat.Ann. tit. 37, § 163.6 (1992), determinative of the issue. Where the taxation is an integral part of the overall regulatory structure in a traditionally heavily regulated area, as opposed to a simple revenue measure, the tax may properly be considered to be regulatory and to fall within the regulatory authority. *See, e.g., Colville,* 447 U.S. at 158, 100 S.Ct. at 2083–84 (noting that taxes may be used for regulatory purposes as well as for raising revenue). Such is the case here. Not only is the tax imposed on transactions involving a heavily regulated commodity, but the tax provisions themselves are contained within Title 37 of the Oklahoma Statutes, the portion of the Oklahoma Code establishing that regulation, rather than in the Revenue and Taxation Code contained in Title 68. The beer tax is thus clearly differentiated in the Oklahoma statutory structure from the sales, gasoline, and income taxes, which are included in Title 68. We therefore hold that the beer taxes at issue in this case are encompassed in the congressional delegation of authority to regulate the sale of alcohol in Indian country contained in 18 U.S.C. § 1161.

■ Moreover, even were we to conclude that the taxation of 3.2% beer is not part of the State's regulatory authority, we would conclude that the beer tax is valid because it is not a tax imposed on the Indian retailer. The statute provides that the following persons are liable for payment of the tax:

(a) Manufacturers. When the sale is made by a manufacturer, located and doing business in this state, to a wholesaler, located and doing business in this state, the tax shall be *paid by the wholesaler.*

. . . . .

(b) Wholesalers. When the sale is made by a wholesaler, located and doing business in this state, to a retail dealer located and doing business in this state, the tax shall be *paid by the wholesaler.* Such wholesalers may sell only to licensed retail dealers nonintoxicating beverages upon which the tax provided by this act *has first been paid by such wholesaler.*

When the sale is made by a wholesaler, located and doing business outside this state, and who has obtained an Oklahoma wholesale beverage dealer's license, to a retail dealer located and doing business in this state, *the wholesaler shall be liable for and must pay* to the Tax Commission the beverage tax due on such sales. In the event of a retail dealer, doing business in this state, purchases beverage from a

wholesaler doing business outside this state, and who does not have an Oklahoma wholesale beverage dealer's license, the retailer shall be liable for and must pay ... the tax due on such sales....

For the purpose of collecting and remitting the tax imposed under this act, the wholesaler collecting such tax is hereby declared to be the agent of the state for such purposes, and his failure to remit or pay such tax to the state, when due, shall constitute embezzlement, any any such wholesaler, upon conviction, shall be punished as provided by law for the embezzlement of public funds.

(c) Retail Dealers. Retail dealers, where the out-of-state manufacturer or wholesaler has paid the tax under the provisions of this act, shall not be required to pay the tax. However, nothing in this act shall operate to relieve any retail dealer from payment of the tax where such retail dealer has at any time in his possession ... nonintoxicating beverages upon which the tax has not been paid.

37 Okla.Stat.Ann. § 163.4 (West 1990 & Supp.1994) (emphases added).

The Tribe argues that, since the statute does not explicitly provide that the legal incidence of the tax is on the consumer, as was the case in the cigarette tax considered in *Washington v. Confederated Tribes of Colville,* 447 U.S. 134, 100 S.Ct. 2069, 2074, 65 L.Ed.2d 10 (1980), or on the wholesaler, the cases such as *Colville* upholding cigarette taxes are inapplicable, and the tax must properly be seen as legally falling on the Indian retailers.

First, we observe that the Supreme Court has squarely rejected the idea that an explicit statutory mandate that the tax be "passed on and collected" is required in order to determine that the legal incidence of a tax does not fall on the Tribe. *California Bd. of Equalization v. Chemehuevi Tribe,* 474 U.S. 9, 11, 106 S.Ct. 289, 290, 88 L.Ed.2d 9 (1985) (per curiam). Rather, the test to be derived from *Colville* and analogous cases "is nothing more than a fair interpretation of the taxing statute as written and applied, without any requirement that pass-through provisions or collection requirements be 'explicitly stat-

ed.'" *Id.; see also, Colville,* 447 U.S. at 141–42 and n. 9, 100 S.Ct. at 2074–75 and n. 9 (accepting conclusion that cigarette tax fell upon first event upon which tax can constitutionally be imposed, *i.e.* the sale to the consumer, despite lack of explicit statutory language imposing legal incidence of tax on consumer); *Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 984 (10th Cir.1987) (accepting district court's conclusion that legal incidence of Oklahoma sales tax fell on consumer despite lack of explicit provision so providing), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988).

A fair interpretation of the beer tax at issue here establishes that the legal incidence of the tax is on the beer wholesaler, and not on the Indian retailer. As set forth above, the statute specifically provides that the wholesaler must pay the tax. The wholesaler is liable for the tax when it first purchases the beer from the manufacturer and when it sells the beer to the retailer. In addition, the statute provides that the wholesaler may only sell beer upon which the tax *has first been paid.* The triggering event for the payment of the tax thus occurs before the sale to the retailer.

The Tribe argues that the triggering event for the imposition of the tax is the actual sale of the beer by the wholesaler to the tribal retailer. This argument is based on the statutory language stating that *"[w]hen the sale is made* by the wholesaler, ... *the tax shall be paid by the wholesaler."* 37 Okla.Stat. Ann. § 163.4(b) (emphasis added). According to the Tribe, since the trigger for the imposition of the tax is an event, *i.e.* the sale transaction itself, that occurs wholly in Indian country, the State has no jurisdiction to tax. This argument is dependent on an erroneous conception of the function of the word "when" in the statute. Contrary to the Tribe's characterization, we believe the word does not carry a temporal connotation, but instead serves as a substitute for the phrase "in the event that." Thus, the proper reading of the above-quoted language is "in the event that the sale is made by the wholesaler, ... the tax shall be paid by the wholesaler." This construction is consonant with the structure of § 163.4, which sets forth a series

of potential transactions, indicating which entity is responsible for paying the tax in each example, and is the only construction that is compatible with the requirement that a wholesaler only sell beer upon which the tax has *first* been paid.[3]

The Tribe also points to the fact that the statute makes the wholesaler the agent of the state for purposes of "collecting" the tax as proof that the statute imposes the tax upon the retailer, *i.e.*, the Tribe, rather than upon the wholesaler. 37 Okla.Stat.Ann. § 163.4(b). After all, the Tribe argues, if the tax is "collected," it must be collected from someone, and that someone must be the retailer. We find this argument unpersuasive in light of the clear statutory language making the wholesaler liable for "paying" the tax. Rather, we conclude that the language making the wholesaler the state's agent for "collecting" the tax is intended to provide the theoretical basis for the remainder of that paragraph making the wholesaler liable for embezzlement of state funds in the event of a failure to remit the appropriate sums to the state.

■ Even if it were true that the economic burden of the tax falls on the Tribe because the wholesalers simply incorporate the tax into the wholesale cost, this would not be determinative of the question of the legal incidence of the tax. Just as a nondiscriminatory tax imposed on a private entity that does business with the United States and that passes the cost of that tax on to the United States does not violate federal sovereign immunity, *see South Carolina v. Baker,*

485 U.S. 505, 521, 108 S.Ct. 1355, 1365–66, 99 L.Ed.2d 592 (1988) (quoting *Alabama v. King & Boozer,* 314 U.S. 1, 8–9, 62 S.Ct. 43, 45–46, 86 L.Ed. 3 (1941)); *id.* 485 U.S. at 523, 108 S.Ct. at 1366–67; *Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 397, 103 S.Ct. 692, 695–96, 74 L.Ed.2d 562 (1983), so a nondiscriminatory tax imposed on non-exempt private entities that do business with Indian tribes and that pass the cost of those taxes on to the tribes does not violate tribal sovereign immunity. *See Seneca–Cayuga Tribe v. State ex rel. Thompson,* 874 F.2d 709, 715 (10th Cir.1989) ("It has long been settled law that retained tribal sovereign immunity is co-extensive with that of the United States.").

■ The Supreme Court has validated the states' authority to collect sales taxes from wholesalers where an Indian tribe refuses to collect those valid taxes from its sales to non-members, *see Oklahoma Tax Com'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 514, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991), despite the fact that such sales taxes are likely to be passed on to the retailer as part of the wholesale price. We conclude that the state may similarly impose a beverage tax upon wholesalers as an integral part of the overall regulatory scheme, despite the possibility that such tax might be included as part of the wholesale price of the beer.

Accordingly, since we hold as a matter of law that the Oklahoma tax on 3.2% beer is authorized as part of the regulatory authority granted by Congress to the states and because we hold that the tax is a tax upon

---

**3.** We are aware that the statute does make retailers responsible for paying the tax in two circumstances—when the retailer purchases beverage from a wholesaler located outside the state who does not have an Oklahoma wholesaler's license and who has not paid the tax, and in any other case where the retailer possesses beer upon which the wholesaler has not paid the tax. Okla. Stat.Ann. tit. 37, § 163.4(b)–(c). Neither situation is before us today. However, we note that the provisions of the statute making the retailer liable for the tax are evidently designed to give the retailer an incentive to ensure that the wholesaler has paid the tax, rather than to make the retailer primarily liable. Of course, in the event that the Tribe were to possess beer upon which the tax had not been paid, the Tribe's sovereign immunity would prevent the state from suing the

Tribe to recover the tax. *See Oklahoma State Tax Com'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 514–15, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991). Thus, inasmuch as the statute provides for the Tribe's potential secondary liability, it is unenforceable. However, in light of the fact that the Tribe is required to have a valid state license to sell beer and those licenses are conditioned on compliance with the relevant laws, we believe that the statutory prohibition on retailers having in their possession beer on which the tax has not been paid provides the state adequate power to enforce the tax provisions without being required to sue the Tribe to recover the tax. If the Tribe were to possess beer on which the wholesaler had not paid the tax, the Tribe's liquor license could be revoked. *See* Oklahoma Stat.Ann. tit. 37, § 163.8; *id.* § 163.11(I)(5).

the wholesaler rather than upon the retailer, there can be no conflict with the Tribe's right to self-government, and the district court properly granted summary judgment in favor of the state on this issue.

## III. MOTOR FUEL TAX

■■■ Oklahoma law imposes several taxes on motor vehicle fuel, totaling sixteen cents per gallon. Okla.Stat.Ann. tit. 68, §§ 502, 502.2, 502.4, 502.6, 516, 520 & 522 (1992). Corresponding taxes are imposed on diesel fuel. *Id.* §§ 502.1, 502.3, 502.5, 502.7 & 522.1. The State exempts from these taxes fuel purchased by the tribe for use in tribally owned vehicles for tribal purposes. (Appellees' Br. at 10.) However, the State contends that when the Tribe purchases fuel for resale at tribally owned gas stations, the tax must be paid. The Tribe argues that these taxes are imposed on the retailer, and consequently are void as direct taxes on the Tribe. The State responds that the taxes are passed on to the consumer in the retail price. The district court accepted the State's analysis as to the incidence of the taxes. The court then concluded that the taxes are not preempted by federal law, and passing to the second step of the analysis, concluded that the fuel taxes did not infringe on tribal sovereignty.

We believe that a fair reading of the statutes involved indicates that the district court erred in two respects. First, in concluding that the taxes were passed on through the retail price to the consumer, the district court substituted economic assumptions for the language of the statutes. The statutes nowhere require the amount of the tax to be included in the retail price at the pump, a requirement which we could interpret as imposing the tax on the consumer. *Cf.* Okla. Stat.Ann. tit. 68, § 302 (cigarette tax to be included in price to consumer). While the statutes do not expressly declare the legal incidence of the taxes to be on the retailer either, we believe that is the clear import of the statutory language.

The statutes imposing the fuel taxes provide that "[t]here is hereby levied an excise tax of [varying amounts] per gallon upon the sale of each and every gallon of gasoline sold, or stored and distributed, or withdrawn from storage, within the state, for sale or use, to be reported and collected as provided by law...." *See, e.g., id.* § 502. The tax remittance procedure indicates that the incidence of the tax is on the retailer. The statute requires the distributors to make monthly reports indicating the amount of fuel received and sold by the distributor, and to remit to the Tax Commission the amount of tax due. *Id.* § 505(B)–(C). The statute goes on to provide that "[m]otor fuel taxes remitted by a distributor *on behalf of a licensed retailer* ... that are subsequently determined to be uncollectible by the distributor may be credited against subsequent motor fuel tax liability imposed by law upon such distributor." *Id.* § 505(C) (emphasis added). Thus, unlike the beer taxes at issue above, the statutes imposing the motor fuel taxes explicitly state that the distributor must remit the tax on behalf of the retailer. Similarly, the statute provides that if the distributor pays the taxes and is subsequently unable to collect the money from the retailer, the distributor may deduct the uncollected amount from its future payments. The statute thus ensures that the distributor is not burdened with the tax. In the fuel tax scheme, the distributor is no more than a transmittal agent for the taxes imposed on the retailer.

Moreover, the exemptions provided in the fuel tax statutes also indicate that the tax is not imposed on the distributor. For example, the exemption for fuel purchased for agricultural use provides that "[e]very person actually engaged in farming ... *may purchase such motor fuel without paying the tax.*" *Id.* § 509(b) (emphasis added). The same section provides that the person involved in agriculture and claiming the exemption must apply for an exemption permit, which he must show to the distributor. *Id.* § 509(d)–(e). Similarly, § 505 of Title 68 gives the retailer the option of paying the tax due on all diesel fuel, or meeting the requirements to be considered a distributor. *Id.* § 505(E). Section 505 thus also indicates that the retailer is responsible for paying the tax.

We think it evident that the import of the language and the structure of the fuel tax

statutes is that the distributor collects the tax from the retail purchaser of the fuel. While it may well be that the tax is ultimately passed on to the consumer at the pump, the question is whether the statutes in question legally impose the taxes on the Tribe. The question of who bears the ultimate economic burden of the tax is distinct from the question of on whom the tax has been imposed. *See White Mountain Apache,* 448 U.S. at 151 n. 15, 100 S.Ct. at 2588 n. 15; *Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 397, 103 S.Ct. 692, 695–96, 74 L.Ed.2d 562 (1983).

Having determined that the motor fuel taxes are legally imposed on the retailer rather than on the distributor or the consumer, we next confront the second error committed by the district court. The district court concluded that the motor fuel taxes were not federally preempted. This conclusion may have been based on the assumption that the statutes imposed the taxes on the consumer. However, since we conclude that the taxes are imposed on the retailer, we must consider thé issue of preemption.

State activity is preempted by federal law when either of two independent barriers is present: if application of state law "would interfere with reservation self-government," or "would impair a right granted or reserved by federal law." *Rice,* 463 U.S. at 718, 103 S.Ct. at 3295 (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). When determining whether application of state law would interfere with Indian self-government, the court must consider the tradition of Indian sovereignty. If there is a tradition of Indian sovereignty in the area concerned, then preemption is presumed absent an explicit statement from Congress that state law shall apply. *Id.* 463 U.S. at 719–20, 103 S.Ct. at 3295–96.

The activity with which we are here concerned is the taxation of motor fuel. Motor fuel, unlike alcoholic beverages, is not a traditionally heavily regulated commodity and the fuel taxes are not part of a comprehensive regulatory scheme. The fuel tax is a simple revenue raising measure of the sort commonly imposed by sovereign governments to fund their activities. Unlike the beer tax, the motor fuel taxes are contained in Title 68 of the Oklahoma statutes, the Revenue and Taxation Code. Here, the proceeds of the fuel tax go almost exclusively to the building and maintaining of highways in the state of Oklahoma, both within Indian country and without. This fact does not alter the nature of the fuel taxes as simple revenue measures. Because they are directed toward funding traditional government activities, the taxes fall within the ambit of the sovereignty of the tribal government. Accordingly, the district court erred in concluding that imposition of the fuel tax on the tribal retailer was not preempted by federal law. Where the state action conflicts with a power within the traditional scope of Indian sovereign authority, preemption is presumed in the absence of an explicit statement of congressional intent to the contrary. *Rice,* 463 U.S. at 719–20, 103 S.Ct. at 3295–96. The state has directed our attention to no such explicit grant of congressional approval of the taxation scheme here at issue and we know of none.[4] Because the presumption of preemption is an independent barrier to the exercise of state authority in Indian country, the district court erred in requiring the Tribe to show that the fuel taxes infringed on the right of tribal self-government. Consequently, the district court's balancing of the respective tribal and state interests at stake was not relevant to the determination of the propriety of the fuel taxes. We therefore hold as a matter of law that the district court erred in granting summary judgment in favor of the State on this issue. We reverse the grant of summary judgment in favor of the state and the district court's denial of the Tribe's motion for summary judgment. We direct the trial court to grant summary judgment in favor of the Tribe on the question of

**4.** In *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151 n. 16, 100 S.Ct. 2578, 2588 n. 16, 65 L.Ed.2d 665 (1980), the Supreme Court declined to reach the question whether Indian reservations might be encompassed by the Hayden– Cartwright Act, 4 U.S.C. § 104, which provides for the imposition of state fuel taxes "on United States military or other reservations." This issue was not raised before this court, and we express no opinion on it.

the imposition of the state motor fuel taxes on Indian retailers.

## IV. SALES TAXES

The third tax contested by the Tribe in the district court was the 4.5% Oklahoma sales tax codified at Okla.Stat.Ann. tit. 68, § 1354 (Supp.1994). The Tribe objected that the State was requiring retail dealers selling to the Tribe at retail to collect the sales tax from the Tribe. The district court granted summary judgment to the State. At oral argument, it became apparent that the sales tax dispute centered on a misconception engendered by a previous position of the Oklahoma State Tax Commission, which position has since been clarified. The State had furnished a letter clarifying its policy on this issue to the Oklahoma Gas and Electric Company in January, 1993. During oral argument counsel for the State indicated that the contents of that letter represented the current State position on the sales tax. The Tribe stated that it did not object to the current State policy, but argued that the State should be required to let retailers in the area know of the new sales tax policy. In light of this development at oral argument, we vacate the district court's grant of summary judgment in favor of the State on the question of the imposition of the sales tax, and we reprint *in haec verba* the contents of the letter explaining the current State position on the sales tax:

> [I]t is the position of the Business Tax Division that sales to an Indian tribe are exempt from state and local sales taxes as outlined in the Division's exemption letter of January 21, 1988, which was provided to all federally-recognized Indian tribes in Oklahoma.

> However, the 1988 letter indicates that the exemption is limited to purchases made by the Tribe for governmental use as opposed to business use. In order to clarify the Division's position, I will further outline the proper limits of the exemption as the Division understands them.

> A tribe may purchase taxable goods and services exempt from sales taxes if the tribe purchases the item directly, makes payment for the purchase directly and if the tribe is the consumer/user of the item, whether the item is used in tribal governmental offices or in a tribally-owned and operated business place.

> Therefore, in order to be entitled to the exemption, the sale must satisfy the following requirements:

> 1. The sale must be made directly to the federally recognized Indian tribe.

> 2. Payment must be received directly from the tribe.

> 3. The tribe must be the consumer or user of the purchased good which is consumed or used within Indian Country.

> In order to document these requirements your company should maintain the following records:

> 1. Invoices or statements of account should be billed to the tribe in its officially recognized name and mailed to the tribe.

> 2. Payment in the form of a bank draft should be drawn on an account owned by the tribe in its name.

> 3. The location at which the service is established should be owned and operated by the tribe on its Indian Country.

> This exemption does not extend to individuals, corporations, partnerships, or other business or legal entities who are purchasing items which may be used on Indian Country and which are purchased ostensibly "for the Tribe" or for business ventures under tribal license or contract with private parties. The exemption only applies to transactions with a federally-recognized Indian tribe itself.

> The exemption also does not extend to purchases of items which a tribe does not use itself, but which it intends to resell to the general public from a business place on Indian Country for the purpose of marketing a tax exemption to those who would otherwise be required to pay sales taxes elsewhere.

(Appellant's Reply Br. Exh. A.) As the Tribe has no objection to the sales tax policy

as expressed in the letter, we need not examine the matter further.[5]

## IV. INCOME TAX

The final issue contested by the Tribe is the imposition of the Oklahoma state income tax on wages paid by the Tribe to persons employed by the Chickasaw Nation on tribal trust lands. The district court ruled this question moot in light of this court's holding in *Sac and Fox Nation v. Oklahoma Tax Comm'n*, 967 F.2d 1425 (10th Cir.1992). In *Sac and Fox*, we held that, absent explicit congressional authorization, the state lacked jurisdiction to tax the income of tribal members earned on tribal reservations. In so holding, we relied on the Supreme Court's decision in *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), to conclude that the residency of the tribal member-employee was irrelevant to the question of immunity from the state income tax. *Sac and Fox*, 967 F.2d at 1428 n. 3. The State filed a petition for certiorari before the Supreme Court on the issue of the applicability of the income tax to employees who are enrolled members of the Tribe. The Sac and Fox also filed a petition for certiorari on the issue of the applicability of the income tax to non-member employees. The Supreme Court denied the petition of the *Sac and Fox*, —— U.S. ——, 113 S.Ct. 466, 121 L.Ed.2d 373 (1992), and granted the State's petition. —— U.S. ——, 113 S.Ct. 459, 121 L.Ed.2d 367 (1992). After the district court dismissed this final issue as moot, the Supreme Court vacated our decision in *Sac and Fox* as to the tribal member employees and remanded the case. —— U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993). The Supreme Court held that while residency in Indian country was sufficient to invoke the *McClanahan* presumption against state jurisdiction to impose an income tax on the income of tribal members earned on tribal reservations, this court had erred in concluding that residency was irrelevant to the *McClanahan* analysis. *Id.* —— U.S. at ——, 113 S.Ct. at 1991. The Court concluded that because all of the Indians in question might live in Indian country, there was no need to consider the question whether Indians not living in Indian country might also be outside the taxing jurisdiction of the state. *Id.* —— U.S. at ——, 113 S.Ct. at 1992. The Court remanded the case for a determination of the residency of the Indians concerned. We further remanded the case to the district court for a residency determination. 7 F.3d 925 (10th Cir.1993).

The Tribe conceded in its brief on appeal that, with respect to tribal member employees, this issue would be controlled by the Supreme Court's ultimate resolution in *Sac and Fox*, which had not been decided at the time the briefs were filed. At oral argument, the Tribe contended that despite the Supreme Court's holding in *Sac and Fox*, the specific treaties between the Chickasaw and the government of the United States barred the imposition of the state income tax on the wages of tribal members employed by tribal businesses, regardless of the residence of those members. The Tribe also asserted at oral argument that, notwithstanding the Supreme Court's decision in *Sac and Fox*, the State is barred by the relevant treaties from applying its income tax to the income of non-members earned from their employment by tribal businesses on tribal lands.

 We first address the validity of the income tax as applied to non-member employees. We hold that the question of the applicability of the Oklahoma income tax to the wages of non-members earned from employment on tribal lands is controlled by this court's decision in *Sac and Fox*. As we noted there, the Supreme Court has generally approved nondiscriminatory taxation of non-member activities, "so long as such taxation does not conflict with relevant statutes

5. Much of the State's Brief on appeal treated the sales tax dispute as though it were based on the Tribe's objections to the State's decision to collect sales taxes from wholesalers selling to the Tribe for resale. The Tribe insisted in its Brief and in its Reply Brief that this was a misstatement of the issue. The Tribe explicitly denied any objection to the current State practice of collecting the sales tax from wholesalers selling to the Tribe for resale, reiterating that its sole objection was to the collection of sales taxes on retail purchases made by the Tribe. In light of the Tribe's characterization of the issue, we need not address the question of the State's requirement that wholesalers selling to the Tribe for resale pay the sales tax.

or treaties or impermissibly interfere with a tribe's ability to govern itself." *Sac and Fox*, 967 F.2d at 1429. The Tribe does not contend that the income tax imposed on non-members in any way interferes with the Tribe's ability to self-govern. Instead, the Tribe relies on the treaty language that "no territory or state shall ever have a right to pass laws for the government of the [Chickasaw Nation] or their descendants" for the proposition that such taxation is barred. (Appellant's Br. at 11). We find this argument unpersuasive on two accounts. First, on its face, the treaty language prohibits the states only from passing laws governing the Tribe and its descendants, not non-members. It is settled that the income tax is imposed on the employee, not the employer: "The theory, which once won a qualified approval, that a tax on income is legally or economically a tax on its source, is no longer tenable." *United States v. County of Fresno*, 429 U.S. 452, 461 n. 9, 97 S.Ct. 699, 704 n. 9, 50 L.Ed.2d 683 (1977) (quoting *Graves v. New York ex rel. O'Keefe*, 306 U.S. 466, 480, 59 S.Ct. 595, 598, 83 L.Ed. 927 (1939)). Therefore, to the extent that the income tax is imposed on non-member employees who have no established claim to tribal ancestry, the tax does not infringe upon the treaty prohibition.[6]

Second, the Supreme Court has rejected the proposition that the economic burden of the income tax is passed on through the employee to the employer in such a way as to interfere with the Tribe's right to govern itself so as to mandate holding the employees immune from the state income tax. *Id.* The purpose of tax immunity

> was not to confer benefits on the employees by relieving them from contributing their share of the financial support of the other government, whose benefits they enjoy, or to give an advantage to a govern-

ment by enabling it to engage employees at salaries lower than those paid for like services by other employers, public or private, but to prevent undue interference with the one government by imposing on it the tax burdens of the other.

*Id.* Since the income tax is not a tax on the source of the income, it does not impose any burden on the tribal government. While the Court in *County of Fresno* and in *Graves* was discussing the tax immunity of federal rather than tribal employees, this difference is not determinative, as "it has long been settled law that retained tribal sovereign immunity is co-extensive with that of the United States." *Seneca–Cayuga Tribe*, 874 F.2d at 715; *see Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 175, 109 S.Ct. 1698, 1706–07, 104 L.Ed.2d 209 (1989). We accordingly hold that the Oklahoma income tax is valid as imposed on non-member employees of Chickasaw businesses on tribal land.[7]

■ We now consider the question of the validity of the Oklahoma income tax as applied to tribal members earning income from tribal employment in Indian country. In *Sac and Fox*, the State of Oklahoma argued that the *McClanahan* presumption against state tax jurisdiction over Indians was limited to Indians living on the Sac and Fox *reservation*, and was not applicable to Indians living in Indian country. As noted above, this court in *Sac and Fox* disagreed and concluded that, under the rule of *McClanahan*, imposition of a state income tax on the income of tribal members earned from tribal employment in Indian country was presumptively barred regardless of the residence of the members, in the absence of express congressional authorization. The Supreme Court reversed and remanded, ruling that the residency of the tribal member was "a significant component of the *McClanahan* presumption against state tax jurisdiction," and that to the

---

6. The fact that the Tribe might be required to withhold and submit the tax does not constitute an unreasonable burden on the Tribe's ability to govern itself. *Colville*, 447 U.S. at 159–60, 100 S.Ct. at 2084–85; *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 483, 96 S.Ct. 1634, 1646, 48 L.Ed.2d 96 (1976).

7. We need not decide whether, in the event that the Tribe were to impose its own income tax

upon the salary of non-members employed in tribal businesses, such a tax would be entitled to the same treatment as the federal income tax under Okla.Stat.Ann. tit. 68, § 2358(D)(8), which provides for the deduction of the amount of such tax from the Oklahoma adjusted gross income for purposes of calculating the Oklahoma income tax, or under any analogous provisions of state law.

extent that this court had ruled without such a reference to residency, this court had erred. *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1991. The Court held, however, that *McClanahan* was not limited to Indians living on a formal reservation, and that residency in Indian country was sufficient to invoke the *McClanahan* presumption against tax jurisdiction. *Id.* With respect to tribal members residing either on the formal reservation or in Indian country and earning income from tribal employment in Indian country, we think it clear that pursuant to *Sac and Fox* the rule of *McClanahan* continues to bar imposition of the state income tax.[8]

We next turn to the somewhat more difficult question of the validity of the state income tax as applied to the income of tribal members employed by tribal businesses in Indian country, but who do not reside either on the formal reservation or in Indian country. The State contends that this issue is controlled by the Supreme Court's decision in *Sac and Fox.* Accordingly, the State argues that the bar to state tax jurisdiction is limited to Indians living on the reservation or in Indian country.

The State's position fundamentally misreads the Court's holding in *Sac and Fox.* In construing *Sac and Fox,* it is important to view the opinion in context. The Court in that case decided a limited question, namely, whether an Indian living in Indian country but not on the formal reservation was encompassed within the *McClanahan* presumption against state tax jurisdiction. As previously discussed, the Court rejected the State's contentions in *Sac and Fox* and held that such Indians were within the scope of *McClanahan.* The *Sac and Fox* Court did not address the question with which we are faced in this case. The Court did, however, indicate that Indians living outside Indian country but earning their salary from tribal employment in Indian country might nevertheless be outside the taxing jurisdiction of the state.[9] *Id.* —— U.S. at ——, 113 S.Ct. at 1992. Thus, the Court recognized that the issue in both *McClanahan* and *Sac and Fox* was the applicability of the *presumption* against state tax jurisdiction, rather than the ultimate determination of whether such jurisdiction existed. This question, which the Court left unresolved, is the issue before us today.

Consonant with the distinction between the presumption against tax jurisdiction and the ultimate question of the existence of such jurisdiction, the Supreme Court in *Sac and Fox* did not rule that the residency of the tribal members on the reservation or in Indian country was the controlling factor in the ultimate determination whether an

---

8. We give no credence whatsoever to the State's argument that the "disestablishment" of the reservation allegedly incurred as a result of the Dawes Act of 1891 removed any bar to state taxing jurisdiction. The Supreme Court has thrice rejected this notion, twice when presented by the same litigant. *See Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1991; *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.,* 498 U.S. 505, 511, 111 S.Ct. 905, 910, 112 L.Ed.2d 1112 (1991); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 477–479, 96 S.Ct. 1634, 1643–44, 48 L.Ed.2d 96 (1976). We assume, with all the dangers inherent in assumptions, that, sooner or later, the State will tire of presenting this argument. *See Sac and Fox,* 967 F.2d at 1428 n. 2 ("It appears as though the State of Oklahoma persists in fighting a battle it has already lost."). *See also Indian Country, U.S.A. v. Oklahoma Tax Comm'n,* 829 F.2d 967, 975 n. 3 (10th Cir.1987), *cert. denied sub nom. Oklahoma Tax Comm'n v. Muscogee Creek Nation,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988) ("The State seems to believe that the Indian country status of the [reservation] rests on whether the exterior boundaries have been dises-

tablished. It does not. ... Tribal lands, trust lands, and certain allotted lands generally remain Indian country despite disestablishment."). *Cf. Hagen v. Utah,* —— U.S. ——, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). In *Hagen,* the Court concluded that the Uintah reservation had been "diminished" by various acts of Congress, and that therefore a town originally within the reservation was now outside the reservation and subject to state criminal jurisdiction. Notwithstanding the diminishment of the Uintah reservation in *Hagen,* there was no question but that the land within the diminished reservation retained its status as Indian country.

9. While the Court made this statement with respect to the tribe's right to self-government rather than preemption by federal law, the latter argument was not raised in *Sac and Fox.* As the right to self-government and preemption by federal law are each independently sufficient bars to the application of state law, we do not believe that the Court's reference to the right to self-government in any way implies that federal preemption would not suffice.

income tax could validly be applied to the income of tribal members employed in Indian country. Rather, such residency is a "significant component" merely of the *presumption* against state tax jurisdiction, and residency in Indian country is sufficient· to invoke the benefit of that presumption. *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1991. To read the Court's decision in *Sac and Fox* as holding categorically that an Indian must live on the formal reservation or in Indian country in order for taxation to be barred, one would have to ignore the plain meaning of the term "presumption," as well as the fact that the Court expressly acknowledged the possibility that such taxation might be barred even as applied to Indians not living on the formal reservation or in Indian country. *See id.* —— U.S. at ——, 113 S.Ct. at 1992 (declining to decide whether taxation might be barred by tribe's right to self-government, independently of its territorial jurisdiction over Indian country); *cf. Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973) (distinguishing between state's lack of authority to tax income arising from activities *occurring on the reservation* and the power to tax income arising from activities off the reservation). Under such a view, rather than being a "significant component" of the presumption, residency on the reservation or in Indian country would be dispositive of the entire preemption determination. We do not believe such was the Supreme Court's intent. We therefore conclude that the proper interpretation of the Court's decisions in *Sac and Fox* and in *McClanahan* is that they merely establish a presumption in favor of Indians and against state tax jurisdiction over Indians living in Indian country and earning income from activities in Indian country. With respect to Indians living outside Indian country but earning income from activities within Indian country, that presumption does not exist. A lack of a presumption, however, is not equivalent to a determination that the state may impose its tax. Rather, the absence of the presumption merely affects the burden-shifting engendered by the presumption. In the absence of the presumption against state tax jurisdiction, the initial burden is no longer on the state to show that there has been an

explicit congressional grant of authority to tax in order to overcome the presumption. Instead, where Indians living outside Indian country are concerned, the initial burden remains on the tribe to show that the tax is barred by one of the two independent barriers to the exercise of state jurisdiction over Indians, *i.e.* interference with reservation self-government or impairment of rights granted or reserved by federal law.

While in *Sac and Fox* the tribe argued—and the Court refused to decide—that the tribe's right to self-government barred the tax, in this case the Chickasaw argue that the taxation is barred by the relevant treaties between the Tribe and the United States, which are, of course, federal law. Applying the rule set forth above, we now turn to the question whether, in the absence of the *McClanahan* presumption, the Tribe has met its burden of showing that the state income tax is preempted as applied to tribal member employees not residing in Indian country but earning their income from tribal employment in Indian country.

"The beginning of our analysis must be with the treaty which the United States Government entered with the [Chickasaw Nation]." *McClanahan,* 411 U.S. at 173–74, 93 S.Ct. at 1263. This analysis requires a particularized examination of the specific treaties involved in this case. In *McClanahan,* the Supreme Court construed the treaty between the United States and the Navajo Nation in 1868. That treaty provided for the setting aside of land "for the use and occupation of the Navajo tribe of Indians," and stated that

no persons except those herein so authorized to do, and except such officers, soldiers, agents, and employ[ee]s of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article.

*Id.* at 174, 93 S.Ct. at 1263. The Court noted that this language did not constitute an explicit statement that the Navajos were to·be exempt from state law or state taxes. Nev-

ertheless, applying the general rule that "[d]oubtful expressions are to be resolved in favor of" the Indians, *id.* (alteration in original) (citation omitted), the Court concluded that the state was barred from imposing its income tax upon the Navajo members on income derived from employment on tribal lands. In so doing, the Court emphasized that the question before it was a narrow one: "whether the State may tax a *reservation Indian* for income earned exclusively on the reservation." *Id.* at 168, 93 S.Ct. at 1260 (emphasis added).

In light of the ambiguous language of the Navajo treaty and the narrow question before the Court in *McClanahan,* it is not unduly surprising that the Court in *Sac and Fox* declined to fashion from *McClanahan* a blanket exemption from state income taxation for all tribal members. This is especially true when one considers that the *Sac and Fox* Court was faced with treaty language even more ambiguous than that in *McClanahan.* The treaty between the United States and the Sac and Fox Tribe provided no more than that the land that the United States ceded to the Sac and Fox "shall remain the property of said Sac and Fox Nation, to the full extent that it is now the property of said Nation—subject only to the rights of the United States therein . . . and subject to the rights, legal and equitable, of those persons that are now legally located thereon. . . ." *Sac and Fox,* —— U.S. at ——, 113 S.Ct. at 1988.

In stark contrast to the language in the treaties between the United States and the Navajo and the Sac and Fox, respectively, the language in the treaty between the Chickasaw and the United States is abundantly clear. Article IV of that treaty provides as follows:

The Government and the people of the United States are hereby obliged to secure to the said [Chickasaw] Nation of Red People the jurisdiction and government of all the persons and property that may be within their limits west, so that *no Territo-*

*ry or State shall ever have right to pass laws for the government of the [Chickasaw] Nation of Red People and their descendants;* and that no part of the land granted them shall ever be embraced in any Territory or State; but *the U.S. shall forever secure said [Chickasaw] Nation from, and against, all laws* except such as from time to time may be enacted in their own National Councils, not inconsistent with the Constitution, Treaties, and Laws of the United States; and except such as may, and which have been enacted by Congress, to the extent that Congress under the Constitution are required to exercise a legislation over Indian Affairs.

7 Stat. 333 (emphasis added).[10] In 1866, the United States reaffirmed the above obligations, stating that

[a]ll the rights, privileges, and immunities heretofore possessed by said nations or individuals thereof, or to which they were entitled under the treaties and legislation heretofore made and had in connection with them, shall be, and are hereby declared to be, in full force, so far as they are consistent with the provisions of this treaty.

Treaty of April 28, 1866, 14 Stat. 769, Art. XLV; *id.* Art. X. These obligations were again reaffirmed in 1871, which reaffirmation stands to this day. *See* 25 U.S.C.A. § 71 (West Supp.1994). *See also* Oklahoma Enabling Act, § 1, 34 Stat. 267, 267–68) (1906) ("[N]othing contained in [the Oklahoma Constitution] shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories. . . .").

In comparison to the treaty at issue in the *Sac and Fox* case, the Chickasaw treaty explicitly provides that no state would ever be permitted to pass laws for the government of the Chickasaw or their descendants. The crucial question in determining the validity of the income tax under the relevant treaty language is therefore whether the law is one imposed on the Chickasaw Nation or its de-

---

**10.** The treaty actually refers to the Choctaw, rather than the Chickasaw. However, in 1837, the Choctaw consented to the formation of a district within their reservation for the Chickasaw, "to be held on the same terms that the Choctaws now hold it." Treaty of January 17, 1837, 11 Stat. 573, Art. I. Thus, the Chickasaw became the beneficiaries of the above language referring to the Choctaw.

scendants. Residency is simply not relevant to this determination. We believe that, reading the treaty as the Indians would have understood it, and construing any ambiguities in the treaty language in favor of the Indians as we must, *see McClanahan*, 411 U.S. at 174, 93 S.Ct. at 1263, the specific treaty involved in this case preempts the imposition of the state income tax on the wages of Chickasaw members, earned on the reservation or in Indian country, regardless of the residence of those members. Accordingly, we hold that, consistent with the Supreme Court's decision in *Sac and Fox*, the Oklahoma income tax may not be imposed on the income of Chickasaw tribal members, earned from tribal enterprises on the reservation or in Indian country, regardless of whether the tribal member actually lives on the reservation or in Indian country.[11] We therefore vacate the district court's dismissal of this issue as moot, reinstate the claim, and direct the district court to grant summary judgment in favor of the Tribe on this issue.

## V. CONCLUSION

To summarize, we AFFIRM the district court's grant of summary judgment in favor of the State on the issue of the imposition of the tax on 3.2% beer. We REVERSE the grant of summary judgment in favor of the State on the issue of the imposition of the state motor fuel taxes, and we direct the district court to GRANT summary judgment in favor of the Tribe on this issue. We VACATE the district court's grant of summary judgment in favor of the State on the issue of the sales taxes. With respect to the income taxes, we AFFIRM the district court's grant of summary judgment in favor of the State on the question of the imposition of the state income taxes on non-member employees of tribal businesses on Chickasaw Indian country. We VACATE the district court's dismissal as moot on the question of the imposition of the state income tax on the wages of tribal member employees earned from tribal employment in Indian country, and who live in Indian country, we REINSTATE the Tribe's claim on this issue, and we direct the district court to GRANT sum-

mary judgment in favor of the Tribe on this issue. We similarly VACATE the district court's dismissal as moot on the question of the taxation of the income of tribal member employees earned from tribal enterprises in Indian country, but who do not reside in Indian country. We also REINSTATE that claim, and we direct the district court to GRANT summary judgment in favor of the Tribe on that issue.

AFFIRMED in part, VACATED in part, REVERSED in part, and REMANDED with instructions.

---

**11.** In so holding, we do not suggest that the state may not impose its income tax on the income of tribal member employees earned outside Indian country. *This issue is not before us.*