**PRAIRIE BAND POTAWATOMI NATION, Plaintiff,**

v.

**Stephen RICHARDS, Secretary of the Kansas Department of Revenue, State of Kansas, Defendant.**

No. 99–4071–JAR.

United States District Court,
D. Kansas.

Jan. 15, 2003.

David Prager, III, Mayetta, KS, for Plaintiff.

John Michael Hale, Kansas Department of Revenue, Topeka, KS, for Defendant.

### MEMORANDUM OPINION AND OR-DER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDG-MENT

ROBINSON, District Judge.

This action is before the Court on defendant's Motion for Summary Judgment (Doc. 49). Plaintiff has filed a Response (Doc. 59) and defendant has filed a Reply (Doc. 68). The Court has reviewed the parties' filings and is now prepared to rule.

## I. FACTS

The following facts are taken from the record and are either stipulated, uncontroverted or viewed in the light most favorable to plaintiff's case. The Court ignores factual assertions that are immaterial, or unsupported by affidavits and/or authenticated and admissible documents. The Court also disregards conclusory statements.

Plaintiff, the Prairie Band Potawatomi Nation ("Tribe"), is a federally recognized Indian tribe whose reservation is in Jackson County, Kansas. Pursuant to the Indian Gaming Regulatory Act,[1] the Tribe owns and operates a casino complex on its reservation land near Mayetta, Kansas. In addition to the casino, the Tribe owns and operates a convenience store and gas station, ("Nation Station"), located near the casino. Gasoline and diesel fuel are imported from outside the reservation for re-sale at the Nation Station. Once the fuel arrives on the reservation, the Nation Station unloads, stores, monitors and dispenses the fuel. Fuel sales made to casino

---

1. 25 U.S.C. § 2701 *et seq.*

patrons and employees account for approximately seventy-three percent of the total fuel sales. An additional eleven percent of fuel sales are made to people who work on the reservation but not for the casino, tribal government employees, and reservation residents. Seventy-one percent of the Nation Station's proceeds are generated by fuel sales.

The Tribe imposes a tax of $.16 per gallon of gasoline and $.18 per gallon of diesel fuel. The Nation Station is subject to $300,000 in tribal fuel taxes per year. The Tribe spends revenue from the fuel tax to construct and maintain roads, including the road leading from U.S. Highway 75 to the Tribe's casino and other roads on and near the reservation. The Tribe also provides government services including law enforcement, fire protection, emergency services, education services, urban planning, court services and other miscellaneous services.

Prior to May of 1995, the Kansas Department of Revenue did not collect motor fuel tax on fuel distributed to Indian lands. Then, in 1995, the Kansas legislature amended the Kansas Motor Fuel Tax Act [2] and the Department of Revenue began to impose fuel tax on fuel distributed to Indian tribes on tribal land. The structure of the fuel tax statute places the legal incidence of the tax on the fuel distributors, but permits the distributors to pass the tax directly to the fuel retailers.[3]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[4] A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[5] A "genuine" factual dispute requires more than a mere scintilla of evidence.[6]

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact.[7] Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[8] The nonmoving party may not rest on its pleadings but must set forth specific facts.[9]

"[The court] must view the record in a light most favorable to the parties opposing the motion for summary judgment."[10] Summary judgment may be granted if the non-moving party's evidence is merely col-

**2.** *See* Kan. Stat. Ann. §§ 79–3401 *et seq.*

**3.** Kan. Stat. Ann. § 79–3409.

**4.** Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993).

**5.** *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

**6.** *Id.* at 252, 106 S.Ct. 2505.

**7.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991).

**8.** *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991).

**9.** *Applied Genetics,* 912 F.2d at 1241.

**10.** *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991).

orable or is not significantly probative.[11] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." [12]

## III. DISCUSSION

The Tribe brought suit seeking injunctive and declaratory relief, asking the Court to issue an order prohibiting the State from collecting motor fuel tax from fuel distributors who deliver fuel to the Nation Station. The Tribe claims that the Indian Commerce Clause,[13] the Tribe's sovereign right to self-government and self-determination, the Act for Admission of Kansas [14] or other federal law prohibits imposition of the Kansas fuel tax laws on distributors distributing fuel to the Tribe. Defendant asserts that summary judgment should be granted because the State is entitled to Eleventh Amendment immunity,[15] the Tribe lacks standing, and the Hayden–Cartwright Act provides congressional consent for imposition of the State's fuel tax.[16] Defendant also asserts that there is no material issue of fact concerning whether the state fuel tax is preempted by federal law, whether the state fuel tax improperly infringes upon the Tribe's sovereign right to self-government, or whether the Kansas Act for Admissions bars imposition of the tax. The Court will take each of defendant's contentions in turn.

### A. Jurisdiction and the Eleventh Amendment

The Tribe asserts that this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1362,[17] which grants district courts original jurisdiction over civil actions brought by federally-recognized Indian tribes wherein the matter in controversy arises under the Constitution, laws or treaties of the United States. Defendant argues that despite the grant of jurisdiction in § 1362, the Eleventh Amendment bars the Tribe's claims. Defendant also asserts that *Ex parte Young*,[18] a legal fiction created to overcome the Eleventh Amendment's bar under certain circumstances, is inapplicable in this case. As discussed below, defendant's arguments are unfounded.

■ The Eleventh Amendment grants states sovereign immunity from suits in federal court brought by the state's own citizens, citizens of another state, citizens of a foreign state, suits by other sovereigns and suits by an Indian tribe.[19] In *Ex parte Young*, the Supreme Court created a legal fiction, circumventing Eleventh Amendment immunity for suits seeking injunctive and declaratory relief against state officers, sued in their official capacity, to enjoin an alleged ongoing violation of

---

**11.** *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505.

**12.** *Id.* at 251–52, 106 S.Ct. 2505.

**13.** U.S. CONST. art. I, § 8 cl. 3.

**14.** *See* Act for Admission of Kansas into the Union, Ch. XX, § 1, 12 Stat. 126 (1861).

**15.** U.S. CONST. amend. XI.

**16.** 4 U.S.C. § 104.

**17.** The Tribe also claims jurisdiction under federal question jurisdiction, 28 U.S.C. § 1331.

**18.** 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

**19.** *Blatchford v. Native Village of Noatak,* 501 U.S. 775, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991); *Principality of Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

federal law.[20] Defendant contends that the *Ex Parte Young* exception is inapplicable in this case because the relief being sought by the Tribe implicates special sovereignty interests.

Defendant points to the Supreme Court case *Idaho v. Coeur d'Alene Tribe of Idaho,*[21] wherein the Court ruled that the *Ex parte Young* exception could not be entertained when the relief requested would be as much of an intrusion on state sovereignty as an award of money damages. In *Coeur d'Alene,* the tribe sought a declaratory judgment against the state establishing its right to quiet enjoyment to submerged lands located within the boundaries of the Coeur d'Alene Reservation.[22] The tribe also sought injunctive relief against various state officials to prevent them from exercising regulatory jurisdiction over the submerged land. The Court determined that the tribe's claims were the functional equivalent to a quiet title action and if relief was granted, it would have divested the state of substantially all regulatory power over the land at issue.[23] Thus, the Court found that the requested relief would affect Idaho's sovereign interests "in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury," defeating plaintiff's *Ex parte Young* action.[24]

Soon after the Supreme Court's *Coeur d'Alene* decision, the Tenth Circuit decided *ANR Pipeline Co. v. Lafaver,*[25] where it held that the states' power to assess and levy personal property taxes on property located within its borders implicated special sovereignty interests, defeating an *Ex parte Young* action. In so holding, the Tenth Circuit interpreted *Coeur d'Alene* as requiring a new two-step analysis for determining whether *Ex parte Young* applies in any given case. According to *ANR Pipeline,* federal courts are to first "examine whether the relief being sought against a state official implicates special sovereignty interests."[26] If the answer to the first inquiry is affirmative, the court "must then determine whether that requested relief is the functional equivalent to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment."[27]

Relying on *Coeur d'Alene* and the *ANR Pipeline,* defendant asserts that an *Ex parte Young* action does not apply in this case because the relief sought by the Tribe implicates special sovereignty interests in the State's system of taxation and the requested relief would be the functional equivalent to money damages against the State. The Court finds defendant's reliance on these cases is misplaced. To rule otherwise would be to ignore the long line of cases decided in federal court relating to state taxation on tribal affairs.[28] As the

---

20. *Ex parte Young,* 209 U.S. at 155–56, 28 S.Ct. 441; *see also Alden v. Maine,* 527 U.S. 706, 747–48, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (affirming the continuing validity of *Ex parte Young* ).

21. 521 U.S. 261, 287, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).

22. *Id.* at 264–65, 117 S.Ct. 2028.

23. *Id.* at 265, 117 S.Ct. 2028.

24. *Id.* at 287, 117 S.Ct. 2028.

25. 150 F.3d 1178, 1193 (10th Cir.1998).

26. *Id.* at 1190 (citations and quotations omitted).

27. *Id.*

28. *See e.g., Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 100 S.Ct. 2578, 65

Ninth Circuit pointed out in *Agua Caliente Band of Cahuilla Indians v. Hardin,*[29] "in the context of state taxation of *tribes,* there are preemption considerations and *competing* sovereignty interest, the merits of which are governed by a long line of cases." The issues presented by state taxation of tribal interests were not present in either *ANR Pipeline* or *Coeur d'Alene,* both of which have been limited to their particular facts.[30] Thus, the Court finds that an *Ex parte Young* action is appropriate under the circumstances of this case.

In the alternative, the Tenth Circuit has ruled that Indian tribes, asserting jurisdiction under 28 U.S.C. § 1362, may seek injunctive relief from state taxation in federal court.[31] In *Sac and Fox,* the Tenth Circuit contemplated, under a set of facts very similar to those at hand, whether Indian tribes could maintain suits in federal court to enjoin collection of the State of Kansas's motor fuel tax. Relying on the Supreme Court's decision in *Moe v. Confederated Salish and Kootenai Tribes,*[32] the court determined that neither the Eleventh Amendment nor the Tax Injunction Act, 28 U.S.C. § 1341, barred the

tribes' suit.[33] The court reached this conclusion notwithstanding the Supreme Court's decision in *Seminole Tribe of Florida v. Florida,*[34] finding that the *Seminole Tribe* Court had expressly recognized that in *Moe* it had reached a different conclusion due to the fact that the case involved an Indian tribe's access to federal court for the purpose of obtaining injunctive relief from state taxation.[35] Based on the *Moe* decision, the Tenth Circuit reasoned that federal courts have jurisdiction under 28 U.S.C. § 1362 to consider the merits of the Kansas fuel tax case.[36] Like the Tenth Circuit, this Court asserts jurisdiction under § 1362 and finds the Eleventh Amendment does not bar this suit.

■ As instructed by the Tenth Circuit in *Sac and Fox,* this Court has jurisdiction and the Eleventh Amendment does not bar the Tribe's claim brought pursuant to § 1362. Further, based on the legal fiction created in *Ex parte Young,* the Court finds that it has jurisdiction to hear this dispute. Therefore, summary judgment is not appropriate based on the State's Eleventh Amendment immunity.

L.Ed.2d 665 (1980); *Moe v. Confederated Salish and Kootenai,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

**29.** 223 F.3d 1041, 1048 (2000).

**30.** *Robinson v. Kansas,* 117 F.Supp.2d 1124, 1136–37 (D.Kan.2000) (noting that Tenth Circuit has made it clear that finding a special sovereignty interest such as those found in *ANR Pipeline* and *Coeur d'Alene* is the exception not the rule) (citing *Buchwald v. Univ. of New Mexico Sch. of Medicine,* 159 F.3d 487 (10th Cir.1998); *Elephant Butte Irrigation Dist. v. Dept. of the Interior,* 160 F.3d 602 (10th Cir.1998); *Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619 (10th Cir.1998); *Ellis v. Univ. of Kansas Med. Ctr.,* 163 F.3d 1186, 1198 (10th Cir.1998); *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1287 (10th Cir.1999).

**31.** See *Sac and Fox Nation of Missouri v. Pierce,* 213 F.3d 566, 571–73 (10th Cir.2000).

See also *Sac and Fox Nation of Missouri,* 979 F.Supp. 1350, 1352–53 (D.Kan.1997).

**32.** 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (upholding an Indian tribe's right to seek injunctive relief from state taxation in federal court).

**33.** *Sac and Fox,* 213 F.3d at 572.

**34.** 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (holding that Article I of the United States Constitution, including the Indian Commerce Clause, does not provide sufficient authority for Congress to abrogate that State's Eleventh Amendment immunity).

**35.** *Sac and Fox,* 213 F.3d at 571 (citing *Blatchford,* 501 U.S. at 784, 111 S.Ct. 2578).

**36.** *Sac and Fox,* 213 F.3d at 572.

## B. Standing

 Under Article III, § 2 United States Constitution, Federal courts have jurisdiction to hear a matter only if an actual "case or controversy" exists.[37] In determining whether a case or controversy exists, the Court must evaluate whether the Tribe has standing to sue.[38]

 As stated by the Tenth Circuit in *Sac and Fox*, the Constitutional standing question addresses "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant its invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on its behalf."[39] To meet the standing requirement, the Tribe must allege "1) a concrete and particularized actual or imminent injury, 2) which is fairly traceable to the defendant's conduct, and 3) which a favorable court decision will redress."[40] In addition to the above mentioned requirements, the Supreme Court has enunciated several other prudential standing requirements. First, a plaintiff must assert its own rights and not those of others.[41] Next, a plaintiff will not meet the standing requirement if he or she asserts a "generalized grievance shared by a large class of citizens."[42] Finally, the interest which a plaintiff wants protected must be within the "zone of interests to be protected by the statute or Constitutional guarantee."[43]

Defendant argues that the Tribe lacks standing to bring this case because the tax in question falls on the distributors, not the Tribe.[44] The Court finds that the Tenth Circuit's decision in *Sac and Fox* settles this issue.

Addressing the exact arguments made by defendant here, the *Sac and Fox* court held that a tribe has standing to sue a state in federal court where the tribe alleges particularized imminent economic injury due to the state's imposition of the fuel tax.[45] In *Sac and Fox*, the state alleged that the tribes did not have standing to bring suit challenging the Kansas motor fuel tax because the legal incidence of the tax falls on the distributors of the fuel rather than on the tribal retailers. The court rejected this argument stating that the court had "little difficulty concluding

---

**37.** U.S. CONST. art. III, § 2.

**38.** *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

**39.** *Sac and Fox*, 213 F.3d at 573 (citations and quotations omitted).

**40.** *Id.* (citing *Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 663–64, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)).

**41.** *Id.* at 573 (citing *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

**42.** *Id.* (quoting *Warth*, 422 U.S. at 499, 95 S.Ct. 2197).

**43.** *Id.* (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)).

**44.** *See Sac and Fox*, 213 F.3d at 580 (holding that the legal incidence of the Kansas fuel tax falls on the distributor, not the retailer).

**45.** *Id.* at 573–74. The Court acknowledges that the case cited by defendant, *Carter v. Montana Dept. of Transp.*, 274 Mont. 39, 905 P.2d 1102 (1995), where the court held a fuel retailer did not have standing to challenge the state fuel tax when the legal incidence of the tax falls on the distributor, is somewhat in contrast to the Tenth Circuit's decision in *Sac and Fox*. Despite the value of the case to defendant's position, the Court finds it is bound by Tenth Circuit precedent, not by Montana Supreme Court precedent. Further, the *Carter* case can be distinguished because the gas station in question was not tribally owned and the case was not brought by the tribe, it was brought by an individual Indian.

that the Tribes [have] constitutional standing to maintain their suit against the State."[46]

■ Like the tribes in *Sac and Fox*, the Tribe here meets the standing criteria to challenge the State's fuel tax.[47] First, the Tribe provides affidavits claiming injury including interference with the right of self government and economic injury caused by the state fuel tax. Next, the alleged injury is directly traceable to the State's desire to impose a fuel tax,[48] in that the Act allows the tax to be passed on directly to the retailers.[49] Finally, deciding in favor of the Tribe will redress the alleged injury because if the distributors who distribute fuel to the Nation Station are not required to pay the tax, there will be no threat of passing the tax through to the Tribe.[50]

Further, like in *Sac and Fox*, the prudential standing principles discussed above do not bar the Court's exercise of jurisdiction.[51] First, the Tribe asserts its own rights to be free from the cost of motor fuel tax. The fact that the consumers and fuel distributors will unquestionably benefit if the Tribe is successful in challenging the tax, does not alter the Court's analysis.[52] Next, because the Tribe has asserted its right to be free from the fuel tax, it is not asserting a "generalized grievance" prohibiting the Court from exercising jurisdiction.[53] Finally, the Tribe's alleged economic interest in being free from taxation is arguably within the "zone of inter-

est" that federal law seeks to protect.[54] In grappling with the "zone of interest" prudential requirement for standing, the Tenth Circuit noted that federal law has long sought to "protect tribal self-government from state interference, including state taxation."[55]

Based on the above analysis, the Court finds that the Tribe has demonstrated that it has standing to bring this action in federal court. Therefore, summary judgment will not be granted on defendant's challenge to the Tribe's standing.

### C. Hayden–Cartwright Act, 4 U.S.C. § 104

Defendant argues that pursuant to the Hayden–Cartwright Act, 4 U.S.C. § 104, Congress consented to the states' power to tax fuel distributions to Indian tribes, leaving the Tribe without recourse to challenge the tax. In pertinent part § 104(a) of the Act states:

> All tax levied by any State, Territory, or the District of Columbia upon, with respect to, or measured by, sales purchases, storage, or use of gasoline or other motor vehicle fuels may be levied, in the same manner and to the same extent, with respect to such fuels when sold by or through post exchanges, ship stores, ship service stores, commissaries, filling stations, licensed traders, and other similar agencies, located on United States military *or other reservations,* when such fuels are not for the exclusive

---

46. *Sac and Fox*, 213 F.3d at 573.

47. *See id.* at 573–74.

48. *Id.* at 574.

49. *See* Kan. Stat. Ann. § 79–3409.

50. *Sac and Fox*, 213 F.3d at 574 (citing Kan. Stat. Ann. § 79–3409).

51. *See id.*

52. *See id.*

53. *Id.*

54. *Id.*

55. *Id.* (citing *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 170–71, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973)).

use of the United States. Such taxes, so levied, shall be paid to the proper taxing authorities of the State . . . within whose borders the reservation may be located.[56]

The State argues that the phrase "other reservations" includes Indian lands and that the term "licensed trader" specifically refers to tribal retailers. The Tribe counters that the Act is ambiguous and that ambiguity should be construed in favor of Indian sovereignty.

Unfortunately, the Court is left with little guidance from the Circuit Courts or the Supreme Court in determining whether Congress intended the phrase "other reservations" to include Indian reservations.[57] Only the Idaho Supreme Court and the United States District Court for the District of Idaho have struggled with this difficult issue.[58] Although the Court is not bound by either of these decisions, the Court finds the decisions persuasive and holds that the Hayden–Cartwright Act does not amount to congressional authorization for states to impose fuel tax on fuel delivered to Indian reservations.

The Court begins its analysis by noting that a state may not levy taxes on Indian tribes or individual Indians inside Indian country without express approval of Congress.[59] Because of the "unique trust relationship" between the United States and Indian Nations, statutes that affect Indians are to be "construed broadly, with any ambiguous provision to be interpreted to their benefit."[60] Unless Congress makes it abundantly clear that it intends to grant taxing authority to the states, the Court must construe the statute as not allowing the taxation of Indians.[61]

Defendant argues that the language in the Hayden–Cartwright Act expressly approves state taxation of fuel delivered in Indian country. The Tribe argues that Congress did not expressly approve state taxation of motor fuel on Indian reservations and that the statute is, at best, ambiguous. Thus, the Tribe argues that the statute must be construed in favor of the Tribe and interpreted so as to not grant such taxing authority. Following the principles elucidated above, the Court agrees with the Tribe and finds that the Hayden–Cart-

---

**56.** (Emphasis added).

**57.** *Sac and Fox*, 213 at 576 ("Neither the Supreme Court nor any of the circuit courts of appeals, nor any court as far as we can discern, has addressed the difficult question of whether Congress intended 4 U.S.C. § 104(a) to encompass Indian lands.")

**58.** *Coeur D'Alene Tribe v. Hammond*, 224 F.Supp.2d 1264 (D.Idaho 2002); *Goodman Oil Co. of Lewiston v. Idaho State Tax Comm'n*, 136 Idaho 53, 28 P.3d 996 (2001), *cert denied*, 534 U.S. 1129, 122 S.Ct. 1068, 151 L.Ed.2d 971 (2002).

**59.** *See County of Yakima v. Confederated Tribes & Bands of Yakima Nation*, 502 U.S. 251, 258, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) ("'[A]bsent cession of jurisdiction or other federal statutes permitting it,' we have held, a state is without power to tax reservation lands and reservations Indians.") (quot-

ing *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)). *See also Montana v. Blackfeet Tribe*, 471 U.S. 759, 764, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) ("The Constitution vests the Federal Government with exclusive authority over relations with Indian tribes . . . and in recognition of the sovereignty retained by Indian tribes even after the formation of the United States, Indian tribes and individuals generally are exempt from state taxation within their territory.")

**60.** *Hammond*, 224 F.Supp.2d at 1268 (citing *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *McClanahan*, 411 U.S. at 174, 93 S.Ct. 1257).

**61.** *Hammond*, 224 F.Supp.2d at 1268.

wright Act does not expressly provide for state taxation on fuels delivered in Indian country.

Defendant argues that the language in the Act, which allows for state taxation of motor fuels sold on "United States military or other reservations,"[62] includes Indian reservations. The Court is not persuaded by defendant's argument. As noted by United States District Court for the District of Idaho in *Hammond,* the term "reservation" has broad meaning and may or may not include Indian reservations.[63] The *Hammond* court explained that the term reservation has been used in land law to describe any body of land which Congress has reserved from sale.[64] The term has also been used to describe "military bases, national parks and monuments, wildlife refuges, and federal property."[65]

Additionally, as articulated by the Idaho Supreme Court in *Goodman Oil,* if Congress intended to include Indian lands in the pertinent part of the statute, § 104(a), it would have done so. The Act uses the phrase "Indian Lands or other federal reservations" in section three and the phrase "Indian reservation roads" in section six.[66] Congress's use of these distinct phrases convinces this Court that Congress could have specified that the entire Act was to apply to Indian reservations or Indian lands but did not. Therefore, by not using the word "Indian Reservation" in the applicable part of the Act, § 104(a), the language of the Act does not clearly show that Congress intended to allow state taxation of tribal fuel.[67]

Defendant also argues that the use of the term "licensed traders" equates to Indians or Indian traders, lending support for the position that Congress intended to allow states to tax in Indian country. The Court disagrees with defendant and finds that use of the term "licensed traders" is also ambiguous and therefore does not support defendant's position that the Act expressly grants states the authority to tax fuel on Indian reservations. As noted by the *Goodman Oil* court, at the time the Hayden–Cartwright Act was passed, the term licensed traders could have meant licensed sellers of malt beverages, licensed retailers on government reservations or licensed traders selling goods on all government reservations.[68] So, once again the term used by Congress is too broad to have the effect of conveying upon states the right to tax Indians. Congress could have used the term licensed Indian traders had it meant to grant states the authority to tax fuel on Indian reservations.

Defendant also urges the Court to resolve any ambiguities in the language of the Act by turning to the Act's legislative history and the executive interpretation of the Act. Defendant insists that the Court is required to defer to agency interpretation of a statute as required by the Supreme Court's decision in *Chevron U.S.A., Inc v. Natural Resources Defense Council.*[69] Defendant argues that the stated purpose of the statute, and two agencies' interpretations show, that the Act applies to Indian reservations. Again, the Court

---

**62.** 4 U.S.C. § 104(a).

**63.** *Hammond,* 224 F.Supp.2d at 1269.

**64.** *Id.* (quoting *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909)).

**65.** *Id.*

**66.** *See Goodman Oil,* 28 P.3d at 1000.

**67.** *Id.*

**68.** *Id.* (citing *Falls City Brewing Co. v. Reeves,* 40 F.Supp. 35 (D.Ky.1941)).

**69.** 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

disagrees. The Court will address defendant's arguments regarding the legislative history and agency interpretation in turn.

First, defendant draws the Court's attention to legislative history explaining the intended purpose of the Act. The purpose of the Act, which was passed in 1936, was to fund the extension of highway construction and maintenance. Congress intended to correct the general unfairness in the sale of fuel exempt from state taxation on federal reservations. The legislative history discussing the purpose of the Act never specifically refers to Indian reservations.[70] Instead, the legislative history only discussed the inequities of selling gasoline free of state tax in "post exchange stores" and "government reservations." Once again, defendant contends that the use of the term government reservations was meant to include Indian reservations. As discussed above, the Court is not convinced that the use of the term "government reservations" includes Indian reservations. Further, as noted by the *Hammond* court, simply because Congress expressed its intent to give up the federal government's exemption from state motor fuel taxes, does not mean Congress was willing to sacrifice the Indians' exemption from the tax as well.[71]

Next, defendant calls the Court's attention to the opinions of the Attorney General and Solicitor of the Department of Interior, alleging that the opinions clarify any ambiguity contained in the language of the

statute Four months after the Act was passed in 1936, the Attorney General stated that the Act applied to a "military reservation, or an Indian reservation ...."[72] Also, the Solicitor of the Department of the Interior concluded that the Act authorizes state taxation of sales of motor fuel purchased on a reservation for tribal enterprise for resale both to non-Indians and members of the tribe.[73]

These statements suggest that the Attorney General and the Solicitor of the Department of Interior believed that the Act applied to Indian reservations, but as discussed in *Goodman Oil*, these statements are not sufficient to clarify the ambiguities contained in the Act.[74] The Attorney General Opinion of 1936 dealt with whether national parks fell within the Act and mentions "Indian Reservations" in passing.[75] The entire passage reads "some of the agencies which are expressly designated in Section 10 apparently are such as usually pertain to military, naval, or Indian reservations and that section does not expressly mention national parks."[76] The qualifier of "apparently" lends weight to this Court's conclusion that the Attorney General's interpretation is ambiguous.

The opinion of the Solicitor of the Department of the Interior is equally ambiguous. Referencing the Act, the Solicitor said "[i]t is not clear, however, whether the Government agencies specified are intended to include such federal agency as the Menominee tribal enterprise and whether

**70.** *See* 80 CONG. REC. 8, 8701 (remarks of Congressman Whittington) ("In post exchange stores and on government reservations, gasoline and motor fuel is being sold free from local taxes. The conferees believe that all local taxes should be collected except when the gasoline or motor vehicle fuels are for the exclusive use of the United States ....").

**71.** *Hammond,* 224 F.Supp.2d at 1269.

**72.** 38 U.S. Op. Atty Gen. 522, 524 (1936).

**73.** Application of Federal and State Taxes to Activities of Menominee Indian Mills, 57 Interior Dec. 129, 138–40 (1940).

**74.** *Goodman Oil,* 28 P.3d at 1000–01.

**75.** *See id.*

**76.** 38 U.S. Op. Atty Gen. 522, 524 (1936).

the reference to reservations includes Indian reservations."[77] While the Solicitor eventually concluded that the taxes could be levied in the circumstances before him, his statement shows that he also found the Act ambiguous.

Further, as noted in *Goodman Oil* and *Hammond,* Congress has recently attempted to pass legislation to authorize the state taxation of fuel sales on Indian reservations.[78] Such an attempt was apparently a recognition by Congress that more precise language would be necessary to grant states the authority to tax fuel on Indian reservations. If Congress intended the Hayden–Cartwright Act to allow for state taxation of fuel on Indian reservations, it is unlikely that Congress would continue to propose bills to permit a tax it apparently already allowed.

Interpreting ambiguities in the Act in favor of the Tribe, the Court finds that the language of the Act does not show that Congress consented to taxation of the Indian reservations. The Court is further not persuaded by defendant's arguments relating to the legislative history or subsequent agency interpretation of the Act. Because Congress must be explicit if it intends to grant states the power to tax within Indian country, and because the Court finds Hayden–Cartwright does not provide for an explicit grant of Congressional authority for state taxation of motor fuel delivered to Indian reservations, de-

fendant's request for summary judgment on this issue is denied.

Because the Hayden–Cartwright Act is not a basis for summary judgment and because there is no jurisdictional bar preventing the Court from moving forward, the Court must now turn to the merits of the case.

### D. Preemption and Tribal Self–Government

Two separate but distinct doctrines pose a barrier to the assertion of state taxation over transactions occurring on reservation land: federal preemption and tribal rights to self-government.[79] These doctrines manifest themselves from the broad authority given to Congress to regulate tribal affairs under the Indian Commerce Clause and from "the semi-independent" position of Indian tribes.[80] The Tribe asserts these doctrines bar the State from imposing its motor fuel tax on fuel delivered to the reservation. The Court is required to analyze the barriers posed by these doctrines independently because either doctrine, standing alone, can be a sufficient basis for holding that Kansas's motor fuel tax is invalid as it relates to fuel delivered to the Tribe's reservation.[81]

### 1. Preemption

It is settled law that a state tax is unenforceable if the legal incidence of the tax falls on an Indian tribe or its members for sales made within Indian country.[82] If, however, the legal incidence

---

**77.** 57 Interior Dec. 129 at 138 (1940).

**78.** *Hammond,* 224 F.Supp.2d at 1269 (citing H.R. No. 3966, 105th Cong.2d Sess. (1998); S. 550 106th Cong. (1999)); *Goodman,* 28 P.3d at 1001.

**79.** *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

**80.** *Id.*

**81.** *Id.*

**82.** *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) ("[W]hen a State attempts to levy a tax directly on an Indian tribe or its members inside Indian country, rather than on non-Indians, we have employed, instead of a balancing inquiry, 'a more categorical approach: Absent cession of jurisdiction or other federal statutes permitting it, we have held

of the tax rests on non-Indians, as it undisputably does here, "no categorical bar prevents enforcement of the tax; if the balance of federal, state, and tribal interests favors the State, and the federal law is not to the contrary, the State may impose its levy."[83] Because the legal incidence of the Kansas motor fuel tax falls on non-Indians, the Court is required to determine if a material issue of fact exists as to whether the balance of the federal, state and tribal interests tilt in favor of the Tribe. The Court must grant defendant's motion for summary judgment if the Court finds the evidence favoring the State's interest in imposing the motor fuel tax is so one-sided that defendant is entitled to prevail as a matter of law.[84]

Ordinarily, when state taxes are imposed on the sale of non-Indian products to non-Indian consumers, the balance of the federal, state and tribal interests tilt in favor of the state.[85] In *Washington v. Confederated Tribes of the Colville Indian Reservation,* the Supreme Court held that while federal policy seeks to foster tribal self-government and economic development, it does not preclude state taxation of sales by Indians to nonmembers of the tribe.[86] In so holding, the Court announced that tribes cannot assert an exemption from state taxation by "imposing their own taxes or otherwise earning revenues by participating in the reservation enterprises."[87] The Court reasoned that "[i]f this assertion were accepted, the

Tribes could impose a nominal tax and open chains of discount stores at reservation borders, selling goods of all descriptions at deep discounts . . . ."[88]

 The Tribe asserts that the rules set forth in *Colville* are inapplicable in this case because unlike the customers who were drawn to the smokeshops to avoid state cigarette tax in *Colville,* gas purchasers are drawn to the Nation Station because of its close proximity to the casino, a tribally owned and operated endeavor. The Ninth Circuit was presented with a similar argument in *Salt River Pima–Maricopa Indian Community v. Arizona.*[89] In that case, the tribe argued that the rules set forth in *Colville* only apply in cases where a tribe attempts to create a "magnet" effect of drawing customers on to the reservation by offering a lower sales tax rate than the state. The court cast serious doubt on the tribe's attempt to read *Colville* so narrowly and held that even if *Colville* is narrowly read, the state tax will be allowed where the tribe is attempting to sell non-Indian products to non-Indians and where the state tax precludes the tribe from creating the type of tax haven the *Colville* court sought to prevent. According to the *Salt River* court, the most important factors in determining that the state tax was not preempted by federal law was that the goods and services sold were non-Indian, the legal incidence of the tax falls on non-Indians and the state provided most of the governmen-

a State is without power to tax reservation lands and reservation Indians.' ").

**83.** *Chickasaw Nation,* 515 U.S. at 459, 115 S.Ct. 2214.

**84.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**85.** *Salt River Pima–Maricopa Indian Cmty. v. Arizona,* 50 F.3d 734, 737 (9th Cir.1995).

**86.** 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980).

**87.** *Id.*

**88.** *Id.*

**89.** 50 F.3d 734.

tal services to those who bear the ultimate economic burden of the state tax.[90] Likewise, in the case before the court, the legal incidence of the tax falls on non-Indians, the Tribe is importing a non-Indian product [91] and selling the product mostly to non-Indians and those who bear the ultimate economic burden of the fuel tax, the consumers, are provided governmental services by the state.[92]

While the Tribe certainly has an interest in raising revenues, that interest is at its weakest when goods are imported from off-reservation for sale to non-Indians.[93] The State's interest in raising revenues is strongest when, as here, non-Indians are taxed, and those taxes are used to provide the taxpayer with government services.[94] Based on the foregoing analysis, it is clear that the preemption balance unmistakably tips in favor of the State. Thus, summary judgment shall be granted as to the Tribe's claim arising under federal preemption.

### 2. Tribal Self–Government

The Tribe also asserts that imposition of the state fuel tax infringes on the Tribe's sovereign right to impose tribal fuel taxes, infringes upon the Tribe's sovereign right to finance and provide essential government services, infringes upon the Tribe's sovereign right to self-government and self-determination, and infringes upon the Tribe's right to conduct business and to economically develop its reservation. "The doctrine of tribal self-government, while constituting an independent barrier to the assertion of state taxing authority over activities taking place on tribal reservations, bears some resemblance to that of federal preemption." [95] Application of this doctrine requires the Court to weigh both state and tribal interests in raising revenue to provide taxpayers with essential government services.

 The Tribe's interest in raising revenues to support essential tribal services is strongest when "the revenues are derived

**90.** *Id.* at 737.

**91.** The court rejects the implication that fuel sold at the Nation Station is an Indian product because the Tribe operates a casino in the vicinity or that fuel is an Indian product because the Tribe financed and constructed the Nation Station to include the proper facilities for unloading, storage, and dispensing of gasoline. *See Chemehuevi Indian Tribe v. California St. Bd. of Equalization,* 800 F.2d 1446 (9th Cir.1986) (rejecting the tribe's assertion that *Colville* is inapposite where the tribe markets cigarettes as part of a legitimate business enterprise, where residents and visitors take advantage of other amenities offered by the tribe).

**92.** *See Sac and Fox,* 213 F.3d at 584 (stating that the ultimate economic burden of the Kansas motor fuel tax "most assuredly falls on the consumer"). As discussed below in section D.2., the court rejects the Tribe's argument that it bears the ultimate economic burden of the fuel tax.

**93.** *Salt River,* 50 F.3d at 739.

**94.** The Tribe has asserted that eleven percent of its fuel sales are derived from sales to reservation residents, tribal government employees and other persons who work on the reservation. The Tribe has not asserted that a majority or even a substantial portion of its fuel sales are made to reservation residents, those who primarily reap the benefits of tribal government services. It cannot be disputed that Kansas provides governmental services off the reservation to the non-Indian purchasers of fuel. In addition, the State also provides services on and near the reservation including maintenance of U.S. Highway 75, the highway that leads to the reservation. In addition to road maintenance, the State provides fire and police protection on and near the reservation.

**95.** *Gila River Indian Cmty. v. Waddell,* 967 F.2d 1404, 1412 (9th Cir.1992) (citing *White Mountain Apache Tribe,* 448 U.S. at 142, 100 S.Ct. 2578).

from *value generated on the reservation* by activities involving the Tribes *and* when the *taxpayer is the recipient of tribal services.*[96] Revenues will not be considered derived from "value generated on the reservation" if the value of the product marketed by the tribe is merely an exemption from state tax. In other words, if the tribe earns its profits simply by importing non-Indian products onto the reservation for resale to non-Indians free from state taxation, the profits are not derived from value generated on Indian lands.[97]

The Tribe asserts that the revenues derived from the fuel sold at the Nation Station are a result of value generated on Indian lands because the casino, operated in close proximity to the gas station, generates a flow of motor vehicle traffic. The Tribe contends that the gasoline market exists because of the nearby casino, not simply because patrons can purchase gas free from state motor fuel tax. Assuming the Tribe can show that they are marketing a product, the value of which is derived on reservation land, the Tribe cannot show that those who ultimately take on the economic burden of the tax, the consumers, are the recipients of tribal services as opposed to state services.[98]

The Tribe proposes that the ultimate economic burden of the tax does not fall on the consumers but rather it falls on the Tribe. The Tribe bases this assertion on the presumption that the tax will destroy the Nation Station's business by burdening the Nation Station with double taxation and interfering with the Tribe's right to impose tribal taxes and to finance its government. The Court cannot agree for several reasons.

First, in *Sac and Fox*, the Tenth Circuit held that even though the legal incidence of the Kansas motor fuel tax falls on the fuel distributors, the ultimate, albeit indirect, economic burden of the Kansas motor fuel tax falls on the consumer.[99] Thus, according to the Tenth Circuit, if the Tribe can show that the ultimate economic burden falls on tribal members as the consumers of the fuel, the tax improperly interferes with internal tribal affairs.[100] Such a showing would require the Tribe to produce evidence that a substantial portion of the Tribe's retail fuel sales are to tribal members. The Tribe cannot make the required showing as their own evidence indicates that only a small percentage of the retail fuel sales are made to tribe members. The Tribe presents evidence indicating that seventy-three percent of the fuel sold at the Nation Station is sold to casino patrons and only eleven percent of the fuel sales are made to persons who live or work on the reservation. Although the Tribe certainly provides substantial services to those persons who live and work on the reservation, that group of persons constitutes only a small portion of the consumers who purchase fuel at the Nation Station. The majority of the fuel

96. *Colville,* 447 U.S. at 156–57, 100 S.Ct. 2069 (emphasis added).

97. *Salt River,* 50 F.3d at 738.

98. *See Sac and Fox,* 213 F.3d at 584 (stating the ultimate economic burden of the Kansas motor fuel tax "most assuredly falls on the consumer").

99. *Sac and Fox,* 213 F.3d at 584. *See also United States v. Mississippi Tax Comm'n,* 421 U.S. 599, 607–10, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975) (holding that the legal incidence of the tax does not always fall upon the entity legally liable for payment of the tax); *Chickasaw Nation v. Oklahoma Tax Comm'n,* 31 F.3d 964, 972 (10th Cir.1994) (noting that the "question of who bears the ultimate economic burden of the tax is distinct from the question of on whom the tax has been imposed.").

100. *Id.*

consumers are not members of the Tribe and are thus recipients of state services.[101]

■ Second, the Tribe's contention that the state fuel tax and the tribe's fuel tax cannot coexist because the result will be double taxation and an increase in the product's cost must also be rejected. There is no question that the Tribe's power to tax transactions occurring on trust lands "is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law ...."[102] But, a tribe cannot oust a state from any power to tax on-reservation purchases by nonmembers of the tribe by simply imposing its own tax on the transactions or by otherwise earning its revenues from the tribal business.[103] Further, any negative economic impact on the Tribe by the imposition of the state fuel tax is not necessarily sufficient to invalidate the tax.[104] Indeed, the state may sometimes impose a "non-discriminatory tax on non-Indian consumers of Indian retailers doing business on the reservation ... even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians."[105]

Finally, the Tribe has failed to show that the state motor fuel tax substantially affects its ability to offer governmental services or in any way affects the Tribe's right to self-government. The Supreme Court has held that merely because the result of imposing the fuel tax will deprive the Tribes of the revenues which they are currently receiving, does not infringe on the right of reservation Indians to "make their own law and be ruled by them."

■ The Tribe's interests in raising revenues simply cannot outweigh the State's legitimate interest in raising revenues through its system of taxation.[106] The State's interest in imposing such a tax is greatest when the "tax is directed at off-reservation value and when the taxpayer is the recipient of state services".[107] In this case, it is undisputed that the legal incidence of the tax is directed off-reservation at the fuel distributors.[108] Further, it is also undisputed that only a small part of the fuel sales are made to persons who either live or work on the reservation who are the recipient of tribal services. The majority of the fuel consumers are recipients of state services. Even if the Court accepts the Tribe's proposition that the fuel sales are a result of value generated on reservation land, the Tribe cannot show that a substantial portion of the taxpayers are recipients of tribal services as opposed to state services. For the above reasons, defendant's motion for summary judgment shall be granted on the Tribe's claim regarding tribal rights to self-government.

---

**101.** The Court recognizes that the Tribe provides some governmental services to non-Indian purchasers by constructing and maintaining reservation roads and providing police protection. But, it cannot be disputed that the vast majority of governmental services used by the non-Indian purchasers are provided by the State, off the reservation.

**102.** *Colville*, 447 U.S. at 152, 100 S.Ct. 2069.

**103.** *Id.* at 154–158, 100 S.Ct. 2069. *See also Gila River Indian Cmty.*, 91 F.3d 1232, 1239 (9th Cir.1996) ("The State and Tribe have concurrent taxing jurisdiction ... [a]ccord-

ingly, the Tribe's tax program is not undermined by the state tax.").

**104.** *Colville*, 447 U.S. at 152, 100 S.Ct. 2069; *Sac and Fox*, 213 F.3d at 583.

**105.** *Colville*, 447 U.S. at 151, 100 S.Ct. 2069.

**106.** *Id.* at 157, 100 S.Ct. 2069. *See also ANR Pipeline*, 150 F.3d at 1193 ("Congress has made it clear in no uncertain terms that a state has a special and fundamental interest in its tax collection system.").

**107.** *Colville*, 447 U.S. at 157, 100 S.Ct. 2069.

**108.** *Sac and Fox*, 213 F.3d at 580.

### E. Kansas Act for Admission

In addition to claims based on preemption and tribal rights to self-government, the Tribe also asserts a claim under the Kansas Act for Admission § 1. The Kansas Act for Admission states that:

> [n]othing contained in said [Kansas] constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with such Indian tribe, is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory . . . .

Based on this language, the Tribe argues that the state is prohibited from taking action that impairs the Tribe's right to impose and collect its own tribal taxes, impairs the Tribes right to finance its government through tribal taxation and imposes on the Tribe's right to engage in sovereign functions of self-government. The Tribe asserts that unlike causes of action based on federal preemption, there is no need to balance the state, federal and tribal interests for claims arising from the Kansas Act for Admission.

■ The Court finds that even if the Kansas Act for Admission can be read to preserve the Tribe's sovereign right to impose tribal taxes on reservation and to engage in commercial business on its reservation as proposed by the Tribe, the Court's foregoing analysis regarding tribal rights to self-government is still applicable. As mentioned above, while the Tribe has every right to impose tribal fuel taxes, by doing so it does not oust the State from

imposing state tax on sales made to non-Indians. Further, even if the state tax imposes on the Tribe's ability to carry-on a commercial business by increasing the cost of the product, a state tax on non-Indians "may be valid even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians."[109] "[T]he tribes have no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all."[110] For these reasons defendant is entitled to judgment as a matter of law and summary judgment is granted on the Tribe's claim asserted under the Kansas Act for Admission.

## IV. CONCLUSION

In finding that the Court has jurisdiction over this matter, the Court rejects defendant's claim to immunity based on the Eleventh Amendment and rejects defendant's claim that the Tribe lacks standing to bring this suit. Additionally, the Court finds, contrary to defendant's arguments, that the Hayden–Cartwright Act does not provide for an explicit grant of Congressional authority for state taxation of motor fuel delivered to Indian reservations. Finally, because no material issue of fact remains regarding the Tribe's claims arising under federal preemption, tribal right to self-government or Kansas Act for Admission and because defendant is entitled to judgment as a matter of law, defendant's motion for summary judgment is granted.

**IT IS THEREFORE BY THE COURT ORDERED** that State's Motion for Summary Judgment (Doc. 59) is GRANTED.

**IT IS SO ORDERED.**

---

**109.** *Colville,* 447 U.S. at 151, 100 S.Ct. 2069. **110.** *Id.*